**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Arthur STREIFEL, Theodore Scott Jube, Steven Jube and Darlene Brennan, Defendants-Appellants.**

No. 1456, Docket 81–1091.

United States Court of Appeals, Second Circuit.

Argued June 10, 1981.

Decided Nov. 23, 1981.

Rehearing and Rehearing In Banc Denied Jan. 26, 1982.

Andrew M. Lawler, New York City, for defendant-appellant Theodore Scott Jube.

Oteri & Weinberg, Boston, Mass. (Martin G. Weinberg, Boston, Mass., and Ivan Fisher, New York City, on the brief), for defendant-appellant Steven Jube.

Gerald B. Lefcourt, New York City, for defendant-appellant Brennan.

Lesley Oelsner, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty. for the Southern District of New York, and Mark F. Pomerantz, Asst. U. S. Atty., New York City, on the brief), for plaintiff-appellee.

Before OAKES and KEARSE, Circuit Judges, and RE,* Chief Judge.

KEARSE, Circuit Judge:

This is an appeal by defendants Theodore Scott Jube, Steven Jube, and Darlene Brennan,[1] from judgments in the United States

---

* Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

1. When this appeal was argued defendant James Arthur Streifel was also an appellant. Like his codefendants, Streifel was free on bail pending appeal. Thereafter Streifel violated his bail conditions and became a fugitive, and his appeal, on motion of the government, was dismissed with prejudice by order of this Court dated August 28, 1981.

District Court for the Southern District of New York, Milton Pollack, *Judge*, convicting them of possession of marijuana with intent to distribute it in violation of 21 U.S.C. §§ 812, 955a (1976), and of conspiracy to possess, import into the United States, and distribute marijuana in violation of 21 U.S.C. §§ 846, 955c, and 963 (1976). The judgments of conviction were entered following court-approved agreements between defendants and the government pursuant to which the defendants pleaded guilty to the possession and conspiracy charges, charges of attempting to import marijuana into the United States were dismissed, and the defendants preserved their rights to appeal the denial of certain suppression motions.[2] On appeal, defendants contend that the warrantless entry onto a ship on the high seas by agents of the United States Coast Guard violated their rights under the Fourth Amendment to the Constitution, and that their motion to suppress certain seized items, including thirty tons of marijuana, should therefore have been granted. For the reasons below, we conclude that the entry was lawful and we therefore affirm the convictions.

## BACKGROUND

The material facts, which have been stipulated by the parties, concern the sighting of a ship by the Coast Guard in the northern Atlantic Ocean approximately 50 miles east of Cape Cod and the boarding of that vessel by Coast Guard agents on the following day. Shortly before 10:00 a. m. on September 24, 1980, a Coast Guard airplane flying a routine patrol off the New England coast sighted a freighter drifting with its engine off and its bow pointed south-south-east. The plane circled over the ship for about fifteen minutes, and determined that "Panama" and the name "ROONDIEP" appeared on the stern of the freighter. While the aircraft was circling, the ship started its engines and began heading due south; the starting of the engines was visible from the Coast Guard plane.

The Coast Guard plane soon resumed in its original northeastern direction, but a number of factors caused the pilot and co-pilot to be suspicious of the ROONDIEP. In their training programs the officers had learned that a typical type of boat on which contraband drugs were carried was a coastal freighter 150–200 feet in length, flying a foreign flag. The pilot and co-pilot had two years' and one and one-half years' experience, respectively, in flying patrols out of Cape Cod. In their previous missions the officers had seen many freighters; generally the freighters had been under way and many had been laden with cargo visible from the air. In their experience a freighter did not drift "dead in the water" unless something was wrong. Because the ROONDIEP was a 210-foot freighter of apparent foreign registry, drifting dead in the water, with no visible cargo, and had started its engines as the aircraft was circling it, the officers contacted the Coast Guard communications center in Boston and asked that the name "ROONDIEP" and the description of the freighter be checked with the El Paso Intelligence Center ("EPIC"). EPIC is a computerized information center of the United States Drug Enforcement Administration which regularly supplies law enforcement agencies with information about vessels suspected of engaging in smuggling. Within the hour,[3] the station in Boston reported that EPIC's reply was "positive" and

**2.** Streifel was sentenced to two concurrent terms of five years' imprisonment, to be followed by two years of special parole. Theodore Scott Jube was sentenced to two concurrent terms of three years' imprisonment, to be followed by two years of special parole. Steven Jube was sentenced under the Federal Youth Corrections Act, 18 U.S.C. § 5017 (1976), to concurrent indeterminate terms of custody for treatment and supervision. Imposition of Brennan's sentence was suspended and she

was placed on probation for a two-year period with the special condition that she participate in a community services program.

**3.** In the meantime, the plane had been instructed, in an unrelated order, to change course and proceed south. Following these instructions, the plane shortly re-sighted the ROONDIEP, which by then was proceeding in a south-southeasterly direction at a speed of about ten knots.

included information that the ROONDIEP had aliases, including the "ROERDOMP" and the "BITTERN," that most recently the ROONDIEP had been sighted anchored off Aruba and had left Aruba without going into port, and that there was reason to suspect that the vessel might be used to smuggle marijuana into the United States. (Later that day, EPIC informed the Coast Guard that the ROONDIEP was not in fact the same ship as the ROERDOMP, alias the BITTERN, which was suspected of smuggling. None of the other information provided by EPIC was retracted.) After receiving the first EPIC message, the aircraft officers contacted Lieutenant Steven Spencer in the Coast Guard's Atlantic Area Command ("Comlantarea") and reported their sighting of the ROONDIEP and EPIC's positive identification. The lieutenant, who had eight years' Coast Guard experience, instructed the plane to relocate the ROONDIEP and maintain surveillance of it until a Coast Guard ship could arrive; he then directed the Coast Guard cutter TAMAROA to intercept the ROONDIEP. Spencer also made official inquiries of the five major United States ports within a day's steaming distance from the ROONDIEP's location, and contacted the Canadian Maritime Command in Halifax; he was informed that none of those ports had seen or heard from the ROONDIEP.[4]

The actions of Lieutenant Spencer, as well as those of the cutter TAMAROA, were supervised by Comlantarea's Operational Intelligence Officer, Commander D. R. Herlihy, who had been extensively involved in the investigation of drug smuggling. Herlihy knew that for several years drug smugglers had used a technique known as the "mother ship" technique, in which a ship loaded with large quantities of marijuana hovers off the United States coast while smaller boats come to the ship, get the marijuana, and take it into shore. Herlihy knew that the "mother ships" often flew foreign flags and that a number of such ships seized by the Coast Guard over the years had flown the Panamanian flag.

At approximately 2:20 p. m., the TAMAROA, captained by Commander Anthony Pettit and having been advised of the ROONDIEP's location by the aircraft pilots, approached the ROONDIEP, and established ship-to-ship radio communication. Conversation between the two ships ensued intermittently for 30 to 40 minutes. During the course of these conversations, the ROONDIEP informed the TAMAROA that its last port of call was Martinique; that its next port of call was as yet unknown because its original orders to go to "Maine or Canada" to pick up lumber had been cancelled; and that it was awaiting new orders, perhaps to go to Europe. The officers asked for permission to board the ROONDIEP; the master of the ROONDIEP refused, saying that he was leaving United States waters and that he saw no need for the Coast Guard to board. Later the ROONDIEP master said he felt the weather was not conducive to bringing the TAMAROA and the ROONDIEP together. When the TAMAROA advised the ROONDIEP that the latter was headed toward a shallow area not part of the standard ship lanes for international traffic, the ROONDIEP master replied that he was not concerned because the ship was in light condition and did not draw much water. On the basis of the circumstances and in particular the ROONDIEP's responses over the radio, Pettit, a fifteen-year veteran of Coast Guard service, suspected that the ROONDIEP might be involved in smuggling. Pettit relayed his information to Herlihy.

All of the circumstances, including the ROONDIEP's appearance, location, actions, and radioed statements to the TAMAROA, led Herlihy to conclude that the ROONDIEP appeared to be a "mother ship" carrying drugs that it wanted to smuggle into the United States. At Herlihy's suggestion, appropriate government officials contacted Panamanian officials to obtain confirmation that the ROONDIEP was of Panamanian registry, to report the suspicion that it was carrying drugs, and to request permission to board it. Panamani-

---

4. Foreign flag ships are required to give 24-hours' advance notice of their planned entry into a United States port. 33 C.F.R. 124.10 (1979).

an officials, as they had done in past instances, gave permission for the Coast Guard to board and search the ship, acting as agent for the Government of Panama. At approximately 8:00 p. m., Herlihy relayed word of the Panamanian government's permission to the TAMAROA, whose commander determined, in the interests of safety, to put off until morning any attempt to board the ROONDIEP. Throughout September 24 the TAMAROA kept pace with the ROONDIEP which, as the day and evening wore on, altered its course from 180° (due south), to 150°, to 120°, to 112°, to 100°, to 90° (due east), and finally, just after midnight, to 95°.

By the morning of September 25 the ROONDIEP was approximately 200 miles from the coast of the United States. At 6:10 a. m. the TAMAROA called the ROONDIEP on bridge-to-bridge radio. During the twenty-minute conversation that ensued the TAMAROA twice ordered the ROONDIEP to "heave to"; the ROONDIEP responded that it was in international waters, that it did not wish to be boarded, and that it did not recognize the Coast Guard's right to board it. Finally, the ROONDIEP asked whether the TAMAROA intended to use force and the latter responded in the affirmative, stating that it was authorized to do so by the Panamanian government. At 6:30 a. m., when the ROONDIEP still refused to stop, the TAMAROA fired six bullets from a .50 caliber machine gun into the water in front of the ROONDIEP's bow. At 6:34 a. m., under protest, the ROONDIEP stopped and put a ladder over its side. At 6:38 a. m., six Coast Guard agents, led by Ensign John Andrzejewski, boarded the ROONDIEP. After asking to see the ship's registry papers, Andrezjewski asked the ROONDIEP's captain, Colin Gregory, what cargo the ship was carrying and was told that it carried none. At 6:58 a. m. Andrezjewski went to the cargo hold, where he smelled marijuana and saw hundreds of bales of marijuana. When he returned to Gregory and asked what was in the hold, Gregory responded that Andrezjewski knew what was in the hold. Andrezjewski thereupon arrested Gregory and the six other persons found aboard the ROONDIEP, who included the defendants here. Following the arrests, the Jube brothers told the Coast Guard officers that they had obtained the marijuana in Colombia some weeks earlier and had come north to deliver it, a task for which each crew member was to receive $100,000.

After being indicted for the narcotics offenses described above, the defendants moved unsuccessfully for the suppression of various items of evidence against them, including items seized from the ROONDIEP and all post-arrest statements made by them aboard the ROONDIEP. On the basis of the stipulated facts the district court ruled, in an opinion reported at 507 F.Supp. 480, that the boarding was authorized by 14 U.S.C. § 89(a) (1976) [5] and by the consent of the Panamanian government, and that the Coast Guard's reasonable suspicions of criminal activity made the boarding of the ROONDIEP a constitutionally permissible investigatory stop under the authority of

---

5. Section 89(a) provides as follows:

(a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In addition, relying on *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974), the court held that the Fourth Amendment was satisfied by the acquisition of Panama's consent to the boarding since Panama had authority over the vessel.

Following the court's denial of the suppression motions the defendants agreed to plead guilty to the charges of possession and conspiracy to possess, import, and distribute marijuana, in exchange for the dismissal of the remaining count, which charged them with attempting to import marijuana. The agreement allows them to pursue on appeal their challenge to the Coast Guard's stop and boarding of the ROONDIEP on the ground that those actions violated the defendants' rights under the Fourth Amendment.

## DISCUSSION

■ The issues for our consideration on this appeal are narrowly circumscribed by reason of the limited scope of the parties' contentions. The defendants attack only the stopping and boarding of the ROONDIEP; they do not challenge the Coast Guard's search that followed the boarding.[6] Nor do the defendants contend that the Coast Guard lacked the requisite statutory or other governmental authorization for the boarding.[7] For its part, the government concedes that the information possessed by the Coast Guard did not rise to the level of probable cause to seize the ship or those on board. The question presented thus is whether, in the absence of probable cause, the stopping and boarding of the ROONDIEP was constitutionally permissible. We conclude that in the circumstances shown here, the stopping and boarding constituted a legitimate investigatory stop that was reasonable within the meaning of the Fourth Amendment.[8]

■ It is fundamental that governmental searches and seizures without war-

**6.** Although initially the defendants had challenged the constitutionality of the search of the cargo hold, that challenge was later expressly waived. *See* 507 F.Supp. at 482, 487. These waivers may well have been prompted by the Supreme Court's decisions in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), and *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), which ruled that persons having neither a property nor a possessory interest in the property seized, and having no legitimate expectation of privacy in the area searched have no standing to challenge the constitutionality of the search.

**7.** In their brief on appeal, defendants state that the district court found "authority for the intrusion . . . in both 14 U.S.C. § 89(a) and Panama's consent (A.19–21). Such authority is not here an issue." We note that § 89 has been held to allow boarding of a foreign flag vessel in circumstances similar to these. *United States v. Williams*, 617 F.2d 1063, 1076 (5th Cir. 1980) (*en banc*); *United States v. Dominguez*, 604 F.2d 304, 308 (4th Cir. 1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980).

**8.** The government advances two alternative grounds on which it urges us to uphold the boarding of the ROONDIEP. First, it argues that the Fourth Amendment simply does not apply to searches and seizures of ships on the high seas. And second, it argues that if the Fourth Amendment is applicable, the consent of the Panamanian government provided a basis for finding the boarding constitutional. While we need not reach either ground, we are constrained to note our skepticism as to the first and our rejection of the second.

In arguing that the Fourth Amendment does not apply to searches and seizures at sea, the government contends principally (1) that statutes passed by the country's first Congress excepted Coast Guard boardings from the Fourth Amendment's requirement of reasonableness, and (2) that the extensive regulation of commercial shipping nullifies any privacy expectation. As for the historical argument, the 1790 statutes are hardly dispositive. Each deals with inspections of vessels in or near American ports, not on the high seas. *See* Act of July 31, 1789, Ch. 5, 1 Stat. 29. *See* Ch. 35, § 31, 1 Stat. 164 (1790). While we do not believe the issue has been squarely raised in the Supreme Court, the Court appears to have assumed that the Fourth Amendment is applicable to Coast Guard searches on the high seas. *See United States v. Lee*, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202 (1927) ("search, if any, of the motor boat at sea did not violate the Constitution, for it was made by the boatswain as an incident of a lawful arrest"). Even were it assumed that the first Congress intended to allow the boarding of ships on the high seas without probable cause, it

rant or probable cause are per se unreasonable under the Fourth Amendment unless they fall within one of the Amendment's few established and well-delineated exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One such exception is the "stop and frisk" exception announced by the Supreme Court in *Terry v. Ohio, supra*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. In *Terry*, the Court ruled that even in the absence of probable cause law enforcement officers may briefly stop a person on the street for investigative purposes; if, however, the stop has the effect of restraining the individual's freedom to walk away, even though he has not been arrested, the person has been "seized" within the meaning of the Fourth Amendment, and that Amendment requires that the stop be reasonable.[9] A determination of the reasonableness of the stop requires the analysis and balancing of two principal factors: the governmental need for the stop, and the degree of intrusiveness of the stop.

The first factor is itself composed chiefly of two elements. First is the nature and extent of the governmental interests involved. Law enforcement is, of course, a cognizable interest:

> would not settle the issue of what is a reasonable search today. *See United States v. Williams*, 617 F.2d 1063, 1095 (5th Cir. 1980) (en banc) (Rubin, J., concurring in result). We are bound to interpret the Fourth Amendment in the light of contemporary notions of privacy as well as contemporary technology. *Cf. Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In 1789, for example, the boarding of a vessel may have been virtually the only means available to conduct an investigation. This is not the case in a world where ship-to-ship radio communication enables the Coast Guard to obtain answers to various questions and ship-to-shore radio often permits speedy verification. We thus believe that the historical argument pressed by the Government is of little help in ruling on the Fourth Amendment question here.
>
> Nor are we persuaded to hold in this case that the Fourth Amendment does not apply because crews on commercial ships, like gun dealers or liquor purveyers, have a greatly reduced expectation of privacy because they know that they are subject "to a full arsenal of governmental regulation," *Marshall v. Barlow's Inc.*, 436 U.S. 307, 313, 98 S.Ct. 1816, 1820–1821, 56 L.Ed.2d 305 (1978). *See United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms industry); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (liquor industry). In the present case the Coast Guard made no attempt to cast its boarding of the ROONDIEP as an administrative inspection. We thus do not regard this as an appropriate occasion to rule on the permissible scope of such administrative actions.
>
> Finally, we reject the government's argument that the consent of the Panamanian government provided an "independent constitutional basis" for the boarding. We do not regard the permission granted by a foreign sovereign whose interest is purely regulatory as the kind of constitutionally sufficient "third-party consent" that was envisioned by *United States v. Matlock, supra*. The efficacy of that type of consent "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes." *Id.* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. Whether or not the permission of Panama provides an additional source of *statutory* authorization, as a "special arrangement" between Panama and the United States pursuant to 19 U.S.C. §§ 1581(h) and 1587(a) (1976), it thus has no bearing on the constitutional issues raised on this appeal. Since the boarding of the ROONDIEP conformed to Fourth Amendment principles, the Panamanian government's permission adds nothing to the constitutional analysis; if the boarding had been unreasonable under the Constitution, permission from a foreign sovereign could not cure the constitutional infirmity. *United States v. Conroy*, 589 F.2d 1258, 1265 (5th Cir.), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979).

**9.** The Court in *Terry* had considerably less question as to the validity of the investigatory stop than as to the reasonableness of the officer's ensuing "frisk" of the suspect:

> It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further.
>
> The crux of this case, however, is not the propriety of Officer McFadden's taking steps to investigate petitioner's suspicious behavior, but rather, whether there was justification for McFadden's invasion of Terry's personal security by searching him for weapons in the course of that investigation.

*Terry v. Ohio, supra*, 392 U.S. at 23, 88 S.Ct. at 1881.

One general interest is of course that of effective crime prevention and detection; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.

*Terry v. Ohio, supra,* 392 U.S. at 22, 88 S.Ct. at 1880. The second element of the government's need to make the stop is the factual basis that implicates the governmental interests in question. Thus, as developed in *Terry* and in subsequent cases involving both pedestrians and persons in vehicles, the government is justified in pursuing its interest in preventing or detecting crime only if the officers are "aware of specific articulable facts, together with rational inferences from those facts that reasonably warrant suspicion" that the individual is, was, or is about to be engaged in criminal activity. *E. g., United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581–2582, 45 L.Ed.2d 607 (1975); *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). This standard is less stringent than probable cause, but it too is "an objective standard," *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1879–1880, requiring a "reasonable and articulable suspicion," *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), and it means that legitimate investigatory stops cannot be made completely at random, *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979), or at the "unfettered discretion of officers in the field." *Brown v. Texas, supra,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). In determining whether an officer's suspicion was reasonable the "totality of the circumstances" must be considered, *United States v. Cortez, supra,* 101 S.Ct. at 695, and "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883. In sum, given appropriate articulable grounds for suspicion, an investigatory stop to prevent or interrupt a crime may be made in the absence of probable cause:

> "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape."

*Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

■ The remaining factor in evaluating the reasonableness of an investigatory stop is the degree of restraint imposed on the individual's freedom. In general, if there is an official seizure of the person, even though there has not been a formal arrest, such a seizure is too intrusive to be supportable on less than probable cause. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In *Dunaway,* the restraint was the police officers' taking the suspect from his neighbor's home to the police station and detaining him there for questioning; he was not technically under arrest, but neither was he free to leave. On the other hand the Court has held that the interception of a moving vehicle, causing it to stop for questioning, is not so intrusive that probable cause is required. *United States v. Brignoni-Ponce, supra; United States v. Cortez, supra* 101 S.Ct. at 697; nor is it unduly intrusive to order that a person stopped for a traffic violation get out of his car. *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). The courts of appeals, applying these principles, have held that stops at gunpoint generally amount to arrests and thus cannot be sustained in the absence of probable cause, *see, e. g., United States v. Ceballos,* 654 F.2d 177 (2d Cir. 1981); *United States ex rel. Walls v. Mancusi,* 406 F.2d 505, 508–09 (2d Cir.), *cert. denied,* 395 U.S. 958, 89 S.Ct. 2099, 23 L.Ed.2d 745 (1969); *United States v. Beck,* 598 F.2d 497 (9th Cir. 1979); *United States v. Ramos-Zaragosa,* 516 F.2d 141 (9th Cir. 1975), but that the "utilization of force in making a stop will not convert the stop into an arrest if it is precipitated by the conduct

of the individual being detained." *United States v. Beck, supra,* 598 F.2d at 501; *United States v. Vasquez,* 638 F.2d 507, 523 (2d Cir. 1980).

■ In general, if there is reasonable ground for suspicion that will justify an investigatory stop, reasonable force may be used to effect that stop. In *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the Supreme Court observed that

> [i]n upholding the "frisk" employed by the officer in [*Terry v. Ohio, supra*], the Court assumed, without explicitly stating, that the Fourth Amendment does not prohibit forcible stops when the officer has a reasonable suspicion that a crime has been or is being committed. See *id.* [392 U.S.] at 32–33 [88 S.Ct. at 1885–1886] (HARLAN, J., concurring ["the officer ... must first have constitutional grounds to insist on an encounter, to make a *forcible* stop." (emphasis in original)]). *Id.,* at 34 [88 S.Ct. at 1886] (WHITE, J., concurring ["the person may be briefly detained against his will while pertinent questions are directed to him."]).

*Id.* at 2591 n.7. The *Summers* Court went on to state that in *Adams v. Williams, supra,*

> the Court relied on *Terry* to hold that an officer could forcibly stop a suspect to investigate an informant's tip that the suspect was armed and carrying narcotics.

101 S.Ct. at 2592 (footnote omitted).

■ Further, the intrusiveness of an investigatory stop does not become unreasonable merely by the fact that it lasts longer than a few minutes. In *Summers,* the Court upheld the detention of a person whose house was to be searched pursuant to a warrant that had been issued. As officers arrived to execute the warrant they encountered the respondent coming down his front steps; they took him back inside and detained him while they searched the premises. Although the duration of the detention is not clear from the Court's opinion, it is apparent that a thorough search was

conducted, since narcotics were found under a bar in the basement. In upholding the detention of the respondent while this search was going on the Court stated that

> the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams.*[12]

> [12] ... If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams.*

*Id.* at 2593.

■ In sum, an officer having a reasonable suspicion, based on articulable, objective facts, that criminal activity is afoot may make an investigatory stop that is reasonable in both its duration and its intrusiveness into the individual's legitimate privacy expectations. In balancing the government's law enforcement interests against the individual's interests it is generally true that the more intrusive the stop, the stronger the justification need be, see *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *United States v. Vasquez, supra,* 638 F.2d at 520, and that "if probable cause is lacking, the intrusion must be no greater than the circumstance require," *id.*

■ We believe these principles are as applicable to searches and seizures on the high seas as they are to searches and seizures on land. Assuming, as we do, the truth of the fundamental proposition that the Fourth Amendment itself applies to searches and seizures by government agents at sea, see note 8, *supra,* we see no reason to suppose that that portion of Fourth Amendment jurisprudence that governs the validity of investigatory stops, developed in land-based cases, is not also applicable at sea. There can be no question that there is a governmental interest to be served. The interest in preventing smuggling of contraband into the United States, or in detecting the commission of other acts in violation of

United States laws does not end at the twelve-mile limit. This law enforcement interest is reflected in several federal laws, not the least of which is 14 U.S.C. § 89(a), which provided the statutory authority for the Coast Guard boarding in the present case. *See* note 7, *supra.* Section 89(a), the full text of which is set out in note 5, *supra,* gives the Coast Guard the power to "make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States," and to use all necessary force to compel compliance with those laws.

Given these law enforcement interests, we cannot say as a general matter either that the nature of the need to stop a vessel to obtain answers to relevant questions is significantly different from the need to make such stops of pedestrians or land vehicles, or that the intensity of that need is significantly less at sea than on land. The intensity of the need may well vary from land to sea, as in some instances the ability of the officials to continue surveillance of a suspect will be greater on land and in others it will be greater at sea. The factors that may affect the need, such as the openness of the medium traveled, or the weather, or the maneuverability of the vehicle, are factors to be weighed in evaluating the need to make an intrusion into the suspect's interests, rather than reasons not to apply Fourth Amendment principles.

Finally, we find no basis for denying the government the use of investigatory stops at sea in the fact that many vessels include living quarters for their owners or their crew. While one has a more legitimate expectation of privacy in one's living quarters than in other areas, this expectation has greater relevance to the scope of a search than to the intrusiveness of a stop. Further, there is no uniformity of circumstance such as to warrant a prohibition against "*Terry* stops" on the water: many boats have no residential quarters; conversely, some land vehicles do have such quarters. And some areas of the common automobile are entitled to greater privacy protection than others. *E. g., Compare New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), *with Robbins v. California,* 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981). Again, the differing expectations of privacy in various kinds of vehicles or vessels may result in differences in the balancing of the interests relevant in assessing the reasonableness of an investigatory stop, but they do not make inapplicable the principles that require the balancing to be done.

In short, we are aware of no compelling reason to fashion a different set of principles for treatment of searches and seizures on the high seas than have been developed by *Terry* and its progeny. *See United States v. Williams,* 617 F.2d 1063, 1095–99 (5th Cir. 1980) (en banc) (Rubin, J., concurring in result). *See also United States v. Lee,* 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927), applying Fourth Amendment principles developed in the open fields of *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), to the high seas. We conclude that any land-sea difference in governmental need or in intrusiveness affects only how the principles are applied, not their applicability.

 Applying "*Terry* stop" principles to the case before us, we have no doubt that the Coast Guard's stop and boarding of the ROONDIEP constituted a seizure of the ship and those on board within the meaning of the Fourth Amendment. The order that the ROONDIEP stop, enforced by the firing of shots in the water in front of its bow, clearly restrained its freedom of movement, and with it the freedom of those on board. *Michigan v. Summers, supra; Terry v. Ohio, supra.* We conclude, however, that, even excluding that bit of EPIC information that was erroneous and therefore retracted before the decision to board was made, the officials had reasonable, articulable grounds for suspecting the ROONDIEP of engaging in activities in violation of the laws of the United States, and that the stop and boarding were not unreasonably intrusive.

■ The decision to stop and board the ROONDIEP was made on the basis of the observations and analyses of officials experienced in the prevention and detection of smuggling into the United States. They had previously dealt with many "mother ship" operations, in which a large vessel lingers offshore while other smaller boats come to pick up narcotics. When last sighted the ROONDIEP had hovered off the coast of Aruba for a time, leaving without going into port. When the Coast Guard first encountered the ROONDIEP it was hovering 50 miles off the United States coast, lying dead in the water for no apparent reason and with no visible cargo. When discovered by the Coast Guard airplane, the ROONDIEP immediately started its engines and commenced to move on. When asked its destination it stated that its original orders had been to go to "Maine or Canada"—an unusual lack of certainty. Nor had officials at the nearest major ports, which included two in Maine and one in Canada, ever heard from the ROONDIEP. The ROONDIEP also had no new orders for a new destination—a circumstance the experienced officers also found suspicious. Having given these suspicious answers, the ROONDIEP bit by bit altered its course until it ultimately was heading nearly directly out to sea. By morning it had moved to a point 200 miles off the coast. On the basis of all the circumstances, the officials were entitled to suspect, drawing on their experience, that the ROONDIEP was engaged in smuggling. The suspicion was reasonable and it justified further investigation.

The stop and boarding of the ROONDIEP were not an unreasonably intrusive means of investigating further. The Coast Guard's suspicions justified a more extensive investigation than could be made merely through additional radio inquiries. The officers were not required to receive answers to their questions from whomever the ROONDIEP master chose to put on the radio. Nor were they required to continue

to assess the veracity of the ROONDIEP's answers through the inferior medium of airwaves rather than face-to-face questioning. Once the Coast Guard reasonably believed that it was receiving evasive answers from the ROONDIEP's captain, it was reasonable to seek an interrogation in person. Given the ROONDIEP's apparent attempt to escape, as well as the various factors indicating that the ROONDIEP might be involved in smuggling, the most practical means of investigation was to board the ROONDIEP.

■ The firing of warning shots to stop the ROONDIEP was not unreasonable, since reasonable force may be used if needed. The ROONDIEP had for some twenty minutes refused to stop upon request. The Coast Guard's firing of shots into the water in front of the ship appears to have been the least drastic way to force the ship to stop, and the shots were directly attributable to the ROONDIEP's refusal to submit to an authorized request to stop.

A law enforcement officer who has duly announced his authority and who has attempted to stop and question a suspect is not required "to simply shrug his shoulders," . . . and abandon his investigation. . . . [T]he officer has the right to detain the suspect against his will. . . . Indeed, the officer "is entitled to make a forcible stop."

*United States v. Gomez*, 633 F.2d 999, 1006 (2d Cir. 1980), *cert. denied*, 450 U.S. 944, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981) (quoting *Adams v. Williams, supra*, 407 U.S. at 145, 92 S.Ct. at 1922–1923). Since the firing of warning shots appears to have been no more intrusive than the circumstances required to get the ROONDIEP to stop, this action was not unreasonable. Nor does it appear that any force was used thereafter. Although it is to be presumed that the six-man boarding party was armed, there is no suggestion that they boarded the ROONDIEP with guns drawn, or even displayed their guns to those on the ROONDIEP.[10]

---

10. We do not intend by this observation to suggest that displays of guns would necessarily

be unreasonable. We are well aware that a "search for narcotics is the kind of transaction

*Cf. United States v. Arra,* 630 F.2d 836, 838–39 (1st Cir. 1980) ("One of the three boarders, Seaman Arce, carried a loaded shotgun, and the other two had handguns. Seaman Arce stood guard over the crew . . . during the course of the document and safety inspection."). And the parties' stipulation indicates that it was only after the marijuana was found in the cargo hold that the Coast Guard officers placed the ROONDIEP master and the other six persons found aboard under arrest.

█ Finally, the stop cannot be impeached on the basis of its duration. Defendants argue that the length of their investigatory detention was unreasonable because 48 minutes elapsed between the first order to stop and the eventual arrests. This contention has no merit in fact or law. First, the initial twenty minutes consisted not of a detention, but of the Coast Guard's futile verbal attempts to persuade the ROONDIEP to stop. Further, the time required to stop and to board a 210-foot freighter cannot be equated with the time required to stop and to approach an automobile. Apparently four minutes elapsed between the warning shots and the ROONDIEP's stopping, and an additional four minutes were required for the boarding party to reach the ROONDIEP. These times seem expeditious in the circumstances. Nor can we say that the twenty minutes between the boarding at 6:38 a. m. and the discovery of the marijuana and arrests at 6:58 a. m. was an undue period. The record is silent as to what occurred during that interval; but we note that defendants' brief on appeal states that after boarding and asking for the ship's registry papers the Coast Guard "wasted no time" in descending to the cargo hold. In all, it appears that the detention during the investigatory stop was of reasonable duration.

that may give rise to sudden violence . . . ." *Michigan v. Summers, supra,* 101 S.Ct. at 2587.

1. Under Article 22 of the Convention on the High Seas, 450 U.N.T.S. 82, 13 U.S.T. 2313, T.I.A.S. No. 5200 (1958), to which the United States and Panama are signatories, a foreign

## CONCLUSION

The stop and boarding of the ROONDIEP were reasonable under the Fourth Amendment. Defendants' motion to suppress was properly denied and their convictions are affirmed.

OAKES, Circuit Judge (dissenting):

I am required to dissent. I agree with both points made in footnote 8 of the majority opinion: the Fourth Amendment does apply to the high seas; *United States v. Williams,* 617 F.2d 1063, 1094–95 (5th Cir. 1980) (en banc) (Rubin, J., concurring), and the consent of the Panamanian government cannot provide a basis for the boarding, *cf. United States v. Conroy,* 589 F.2d 1258, 1265 (5th Cir.) (consent of foreign authorities to a seizure unconstitutional in the United States does not dissipate its illegality), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979).[1] Nothing I say here, moreover, relates to United States vessels, to searches of either foreign or United States vessels within territorial waters (the three-mile limit) or contiguous waters (the twelve-mile limit), *see* Note, *High On the Seas: Drug Smuggling, the Fourth Amendment, and Warrantless Searches at Sea,* 93 Harv.L.Rev. 725, 731–38 (1980), or to administrative vessel-safety inspections, *see id.* at 738–50. And I readily agree with Judges Rubin, Kravitch, Johnson, and Randall of the Fifth Circuit that with probable cause and the usual exigencies involved in the case of vessels, a warrantless search may be conducted. *United States v. Williams,* 617 F.2d at 1098–99 (Rubin, J., concurring); Note, *supra,* 93 Harv.L.Rev. at 727–31.

The case at hand, however, involves the stop and boarding of a foreign vessel on the high seas without probable cause. Unless the ultimately responsible agency promulgates neutral, reviewable rules, I cannot see extending the *Terry* exception, *Terry v.*

merchant ship on the high seas may not be boarded unless there is reasonable ground for suspecting that the ship is engaged in piracy or slave trade, or, though flying a foreign flag, is actually of the same nationality as the boarding ship.

*Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (law of "stop and frisk"), beyond situations involving an officer on the beat to situations involving "a *course of organized police conduct*," *United States v. Vasquez*, 612 F.2d 1338, 1349 (2d Cir. 1979) (Oakes, J., dissenting) (airport searches by agents of the Drug Enforcement Administration) (emphasis in original), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980). Such rulemaking would both regulate the discretion of law enforcement officers and for the most part eliminate the need, on review, for ad hoc, case-by-case examinations of whether those officers' suspicions, falling short of probable cause, are reasonable in light of their experience.

The Supreme Court has indicated that *Terry* should be interpreted narrowly, *see Dunaway v. New York*, 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979) ("Because *Terry* involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope. *Terry* itself involved a limited, on-the-street frisk for weapons"); *Sibron v. New York*, 392 U.S. 40, 60–61 n.20, 65, 88 S.Ct. 1889, 1901–1903 n.20, 1904, 20 L.Ed.2d 917 (1968) (companion case to *Terry*). *See also Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640–2641, 61 L.Ed.2d 357 (1979); *Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1922–1923, 32 L.Ed.2d 612 (1972).

A narrow reading of *Terry* is appropriate because each successive extension of the rule that officers on the beat may make investigatory stops based on reasonable suspicion subjects expectations of privacy to arbitrary invasions at the discretion of individual law enforcement agents. This concern, discussed by the court in *United States v. Barbera*, 514 F.2d 294 (2d Cir. 1975) (border searches), gives rise to the "regulatory" view of the Fourth Amendment that I have previously endorsed, *see United States v. Martino*, 664 F.2d 860, 878 (2d Cir. 1981) (Oakes, J., concurring); *United States v. Vasquez*, 612 F.2d at 1348, 1352 (Oakes, J., dissenting), and that I continue to support here. I fear that a continuously widened *Terry* exception will eventually swallow the Fourth

Amendment; that the "stop and frisk," already permissible by officers on the beat, *Terry, Sibron, Adams, Dunaway*; at the border, *United States v. Ramsey*, 431 U.S. 606, 621–22, 97 S.Ct. 1972, 1981–1982, 52 L.Ed.2d 617 (1977); and at the border's "functional equivalent," *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539–2540, 37 L.Ed.2d 596 (1973), will become a general search warrant putting, in the words of James Otis, "the liberty of every man in the hands of every petty officer." *See* Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 438 (1974).

This regulatory approach, applicable where organized police conduct makes practicable the codification of procedures, would not render the law enforcement agencies of the United States powerless to interdict drug traffic and more particularly to stop "mother ships." There is no reason that the United States Coast Guard, the Drug Enforcement Administration, and the Customs Service cannot devise "a plan embodying explicit, neutral limitations on the conduct of individual officers," *Brown v. Texas*, 443 U.S. at 51, 99 S.Ct. at 2640–2641. *See also Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); *United States v. Martinez-Fuerte*, 428 U.S. 543, 558, 562, 96 S.Ct. 3074, 3083, 3085, 49 L.Ed.2d 1116 (1976). Evidently there are already Coast Guard boarding manuals, *see* Note, *supra*, 93 Harv.L.Rev. at 725 n.5, and both the Coast Guard and the Customs Service have printed formal profiles of smuggling vessels, *id.* at 730 n.28. The EPIC computer system may also be taken into account though not, perhaps, given conclusive effect. *Cf. United States v. Sanders*, 663 F.2d 1, 4 (2d Cir. 1981) (border search relying in part on Treasury Enforcement Computer Systems printout held reasonable); *United States v. Asbury*, 586 F.2d 973, 976 (2d Cir. 1978).

As I read 14 U.S.C. § 89, the statute under which the Coast Guard made the search and seizure in the instant case, Congress contemplated the adoption of rules and regulations by which the officers of the Coast Guard would act. Under subparagraph (b) of section 89, printed in full in the

margin,[2] Coast Guard officers enforcing the narcotics laws are agents of the particular executive department charged with the administration of those laws and are "subject to all the rules and regulations promulgated by such department . . . with respect to the enforcement of that law." Just as Congress contemplated rules and regulations "prescribed by the Attorney General" relating to border searches conducted by the Immigration and Naturalization Service, 8 U.S.C. § 1357(a)(3); *United States v. Barbera*, 514 F.2d at 296–97, so too are regulations contemplated in the case of high-seas stops pursuant to section 89. Absent either a warrant, probable cause coupled with the usual exigencies, or conformity to reviewable rules and regulations, I do not believe that the Fourth Amendment permits the search of foreign vessels on the high seas. Accordingly, it being conceded that none of these was present here, I am compelled to dissent.

---

2. (b) The officers of the Coast Guard insofar as they are engaged, pursuant to the authority contained in this section, in enforcing any law of the United States shall:

(1) be deemed to be acting as agents of the particular executive department or independent establishment charged with the administration of the particular law; and

(2) be subject to all the rules and regulations promulgated by such department or independent establishment with respect to the enforcement of that law.

14 U.S.C. § 89(b).