**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard Harry REEH, Arlington Douglas Sprecher, Theodore Duaine Jorden and Gary Michael Ryan, Defendants-Appellants.**

No. 84–5724.

United States Court of Appeals,
Eleventh Circuit.

Jan. 27, 1986.

Carlton & Carlton, Philip Carlton, Jr., Miami, Fla., for defendants-appellants.

Joseph Buchanan, Linda Collins-Hertz, David Leiwant, Thomas Fitzgerald, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before VANCE and HATCHETT, Circuit Judges, and ATKINS,* District Judge.

VANCE, Circuit Judge:

The defendants in this case were convicted on drug trafficking charges after the United States Coast Guard stopped and boarded their vessel in international waters and found it to contain a large amount of marijuana. Concluding that the Coast Guard's boarding of the vessel was reasonable under the fourth amendment, we affirm the convictions.

I.

On January 13, 1982, the Coast Guard cutter TAMAROA sighted a vessel in international waters near the southeastern tip of Cuba. The vessel was traveling northeast through an area known as the "Windward Passage," a route often used by drug smugglers attempting to transport their cargoes to the United States.

As the TAMAROA approached the vessel, Coast Guard Commander Pettit tentatively identified the craft as the JIM HAWKINS. Commander Pettit was familiar with the JIM HAWKINS, a high-quality

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

motor sailer of unusual design, from a magazine article and from having examined the craft personally several years earlier in the United States. The ship's identity was confirmed when Commander Pettit observed the name JIM HAWKINS on the vessel's stern.

The TAMAROA initiated radio contact with the JIM HAWKINS and was told that the vessel's home port was Georgetown, Grand Cayman, that the vessel was of United Kingdom registry, that those aboard were Canadian citizens, and that the vessel was headed for the Bahamas. Commander Pettit remembered that the JIM HAWKINS had been an American vessel when he had last seen it, but was told by an unidentified spokesman aboard the boat that it had been sold. Commander Pettit requested permission to board the JIM HAWKINS for a document and identification check. The spokesman denied the request, pointing out that the JIM HAWKINS was a U.K. flag vessel on the high seas and hence not subject to the jurisdiction of the U.S. Coast Guard.

The denial of permission to board worried Commander Pettit; it sounded unusually defensive and legalistic. Other factors also aroused Commander Pettit's suspicions. Although he believed the voyage would have been more economical by sail, the JIM HAWKINS was proceeding under engine power. The vessel was riding low in the water and appeared to be heavily laden. The waterline was dirty, something Commander Pettit considered unusual for a prize vessel such as the JIM HAWKINS.

As a result of his suspicions, Commander Pettit requested and received authority from his Coast Guard superiors to board the vessel. Permission was not obtained from British authorities, although Britain withdrew its right to object to the boarding several days after the incident. Upon boarding, a party from the TAMAROA discovered four crew members—the defendants—and, eventually,[1] a large quantity of marijuana.

 The crew members, who turned out to be Americans, not Canadians, were arrested and taken to Miami. Each was charged with violating 21 U.S.C. § 955a(b), which prohibits possession of controlled substances with intent to distribute by a U.S. citizen on any vessel, and 21 U.S.C. § 955c, which outlaws conspiracy to violate section 955a. After a somewhat complicated procedural history which included a previous appeal to this court, *United States v. Reeh*, 725 F.2d 633 (11th Cir.1984), all four defendants were convicted on both the substantive and conspiracy counts. On appeal, the defendants contend that the Coast Guard's stopping and boarding of the JIM HAWKINS constituted an unreasonable seizure of the vessel in violation of the fourth amendment.[2] Consequently, they argue, the district court erred in refusing to suppress the evidence as a result of the illegal seizure.

## II.

### A.

Our consideration of this case must begin with the former fifth circuit's en banc

---

1. After a member of the boarding party detected the odor of marijuana, a search ensued during which the marijuana was discovered. The defendants do not contest the legality of the search.

2. Two additional issues raised by the defendants do not merit extended discussion. First, they contend that the district court improperly admitted a statement volunteered by one of the defendants before they had been given their *Miranda* rights to the effect that all four defendants were Americans. We find it unnecessary to reach this issue because we believe that the other evidence of citizenship introduced by the government at trial, none of which was contra-

dicted, conclusively established that the defendants were U.S. citizens even if the disputed statement had been excluded. Second, they argue that because the JIM HAWKINS was traveling in international waters, the United States lacks jurisdiction over the case. This argument borders on the frivolous. The defendants are all U.S. citizens, *see supra*, and a state may punish the wrongful conduct of its citizens no matter where it takes place. *United States v. Mitchell*, 553 F.2d 996, 1001 (5th Cir.1977). The defendants do not argue that the statutes under which they were convicted were not intended to have extraterritorial application. *Cf. id.* at 1001–02.

decision in *United States v. Williams*, 617 F.2d 1063 (5th Cir.1980). In *Williams*, the court held that the Coast Guard may properly stop and board a foreign vessel in international waters under 14 U.S.C. § 89(a) if it has a reasonable suspicion that the vessel is engaged in smuggling contraband into the United States. *Id.* at 1076. Existence of such "reasonable suspicion," the court concluded, satisfies both section 89(a)'s requirement that the vessel be "subject to the jurisdiction, or to the operation of any law, of the United States," and the fourth amendment's requirement that the seizure be reasonable. Under *Williams*, therefore, the seizure of the JIM HAWKINS was proper, and the evidence in question admissible, if the Coast Guard reasonably suspected that the vessel was being used to smuggle drugs or other contraband into this country.[3]

### B.

As with probable cause, there is no litmus test for reasonable suspicion; "[e]ach case must turn on the totality of the particular circumstances." *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 n. 10, 95 S.Ct. 2574, 2582 n. 10, 45 L.Ed.2d 607 (1975). Nevertheless, our precedents circumscribe our inquiry into the existence of reasonable suspicion to some extent. It is settled, for example, that a mere generalized suspicion or hunch does not constitute reasonable suspicion.

*United States v. Villamonte-Marquez*, 652 F.2d 481, 488 (5th Cir. Aug. 3, 1981), *reversed on other grounds*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed. 22 (1983). Instead, reasonable suspicion must be based on "specific articulable facts, together with rational inferences from those facts." *Brignoni-Ponce*, 422 U.S. at 884, 95 S.Ct. at 2582. On the other hand, it is also well established that circumstances completely consistent with legal conduct may still amount to reasonable suspicion. In *United States v. Ruano*, 647 F.2d 577 (5th Cir. Unit B 1981), for instance, Customs Service agents observed two boats traveling at an unusually high speed at 8:15 a.m. The agents saw only one person on each boat, too few for fishing, and noted that the boats did not observe the usual custom of slowing down at a particular point. There could have been any number of entirely innocent explanations for the circumstances observed by the Customs Service. Nevertheless, we held that the circumstances justified reasonable suspicion. *See also United States v. Andreu*, 715 F.2d 1497 (11th Cir.1983); *United States v. Gollwitzer*, 697 F.2d 1357 (11th Cir.1983). Indeed, because an officer "is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling," *Brignoni-Ponce*, 422 U.S. at 885, 95 S.Ct. at 2582, circumstances which would not seem the least bit suspicious to the casual observer may, to an officer, constitute

---

**3.** The stopping and boarding might also be found proper under two additional theories. First, the United States/United Kingdom Bilateral Narcotics Agreement permits U.S. authorities to board "private vessels under the British flag in any case in which those authorities reasonably believe that the vessel has on board a cargo of drugs for importation into the United States in violation of the laws of the United States." The agreement's standard of "reasonable belief" appears quite similar, if not identical, to the "reasonable suspicion" standard. Implementation of this standard by executive agreement may fulfill the reasonableness requirement of the fourth amendment. *See Williams*, 617 F.2d at 1074. Because we determine that the boarding was permitted by 14 U.S.C. § 89(a), however, we need not reach this issue.

The boarding also would have been proper if Commander Pettit had reasonably suspected

that the JIM HAWKINS was really an American vessel despite its spokesman's assertion that the vessel was of U.K. registry. *See United States v. Marino-Garcia*, 679 F.2d 1373, 1386 (11th Cir. 1982), *cert. denied*, 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983). We believe that reasonable grounds existed for suspicion that the JIM HAWKINS was an American flag vessel, given the defensiveness of the spokesman's denial of permission to board (indicating a desire to avoid U.S. authorities) and the fact that Commander Pettit knew from his previous experience with the ship that it had been a U.S. vessel. Although reasonable suspicion would have been justified, however, it appears from the record that Commander Pettit did not actually hold such a suspicion. We therefore do not decide the legality of the boarding on this ground.

grounds for reasonable suspicion. Similarly, since reasonable suspicion depends upon the "totality of the circumstances," *Brignoni-Ponce*, 422 U.S. at 885 n. 10, 95 S.Ct. at 2582 n. 10, circumstances which, considered individually, would not seem particularly suspicious even to an officer may justify reasonable suspicion when considered together. *See, e.g., Andreu*, 715 F.2d at 1499–1500 (circumstances included time of day, amount of teakwood on deck, and fact that deck was wet).

We also note that what constitutes reasonable suspicion varies to some extent with the intrusiveness of the search or seizure in question. " '[T]he greater the intrusion, the greater must be the reason for conducting a search that results in such invasion.' ... Thus, what constitutes 'reasonable suspicion' to justify a particular search may not suffice to justify a more intrusive or demeaning search." *United States v. Afanador*, 567 F.2d 1325, 1328 (5th Cir.1978) (citation omitted).

With these principles in mind, we turn to consideration of the particular circumstances surrounding the stopping and boarding of the JIM HAWKINS.

### C.

The government points to several "articulable facts" which, it argues, taken together gave the Coast Guard reasonable grounds to suspect that the vessel was being used for smuggling. Permission to board was denied in a defensive manner. The ship was riding low in the water and appeared to be heavily laden. The waterline was dirty. Although the weather was suitable for sailing, the vessel was proceeding on auxiliary power.[4]

The defendants do not dispute the existence of the circumstances relied upon by the Coast Guard, but rather contend that they do not justify reasonable suspicion. They argue that the circumstances were entirely consistent with innocent conduct. We agree that any of the circumstances, taken individually, might not seem particularly suspicious. Even considered as a group, such circumstances could very well be present in the absence of criminal activity. As noted above, however, that particular circumstances do not *necessarily* indicate illegal conduct does not mean that the circumstances do not support a *reasonable suspicion* of illegal conduct. A holding that circumstances must be completely inconsistent with innocent activity before they may support reasonable suspicion would prohibit law enforcement officers from stopping and boarding a foreign vessel on the high seas unless the officers could, before boarding, already prove the existence of criminal activity. Such a holding would wreak havoc with the concept of reasonable suspicion and would render the Coast Guard virtually powerless against drug smugglers outside U.S. territorial waters.

■ The defendants also contend that reasonable suspicion could not properly be based, even in part, on their denial of permission to board. They claim in brief that since they had the legal right to refuse permission, "it is inconceivable that [the government] could readily point to [the refusal] as a valid point" to determine the existence of reasonable suspicion. This argument ignores the fact that it was not the mere denial of permission but rather the defensiveness of the denial which aroused suspicion. In any event, reliance on the denial of permission to board to support reasonable suspicion is not only conceivable but proper under the case law of this circuit. *See, e.g., United States v. Postal*, 589 F.2d 862, 890 (5th Cir.) (considering refusal to permit boarding as one of several circumstances supporting probable cause), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979).

---

**4.** Although not relied upon by the government on appeal, the failure of any of the defendants to appear on the deck of the vessel after the Coast Guard established radio contact also supports reasonable suspicion. Commander Pettit testified below that people on board vessels engaged in illegal activity generally stay hidden when a Coast Guard vessel establishes contact, while those aboard vessels engaged in innocent conduct are likely to appear on deck.

■ We agree with the government that, under the totality of the circumstances, and in light of the Coast Guard's special expertise in detecting smuggling and the minimal nature of the intrusion at issue, *see Williams*, 617 F.2d at 1083 ("the seizure of a nautical vessel is a very limited and foreseeable intrusion"), the Coast Guard had reasonable grounds to suspect that the JIM HAWKINS was engaged in smuggling. Although certainly not conclusive proof of guilt, and perhaps not even sufficient to support a finding of probable cause, the circumstances were at least as compelling as those held sufficient to justify reasonable suspicion in *Ruano*.

■ We also conclude that the Coast Guard could have reasonably suspected that the JIM HAWKINS was headed for the United States. When sighted, the vessel was headed northeast—not directly toward the United States, but certainly in a direction and from a locale which made this country a reasonable possibility as a destination. In addition, the vessel was traveling along a route known to be frequented by drug smugglers heading for the United States. Proximity to the border and previous experience with traffic patterns may be taken into account in deciding whether there is reasonable suspicion to stop a car in a U.S. border area to check for illegal aliens. *Brignoni-Ponce*, 422 U.S. at 885–86, 95 S.Ct. at 2582. We see no reason why the same factors should not be taken into account with regard to drug trafficking by sea.

### III.

The government also contends that the boarding of the JIM HAWKINS was constitutional because the government of the United Kingdom consented to the boarding. We agree.

■ We note first that the boarding of a foreign vessel pursuant to the consent of the vessel's flag state is authorized by statute. Under 19 U.S.C. §§ 1581(h) and 1587(a), "officers of the customs"—which includes Coast Guard officers, *see* 19 U.S.C. § 1401(i)—are permitted to board and examine a foreign vessel "under special arrangement" with the vessel's home government. We agree with the first and fourth circuits that consent from the flag state "constitute[s] just such a 'special arrangement.'" *United States v. Green*, 671 F.2d 46, 51 (1st Cir.), *cert. denied*, 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982); *accord United States v. Dominguez*, 604 F.2d 304, 308 (4th Cir.1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980). A boarding by consent of the flag state is thus not a "lawless governmental intrusion," and hence not "unconstitutional per se." *Williams*, 617 F.2d at 1074.

■ Such a boarding could, of course, be authorized by statute and still be unconstitutional if it was not reasonable under the fourth amendment. Whether a search or seizure was reasonable depends on the circumstances. *United States v. Montoya*, — U.S. ——, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985). Generally, the less intrusive the search or seizure, and the less the expectation of privacy involved, the broader the scope of what is reasonable.

Although recognizing that the fourth amendment applies to the boarding of a vessel, we have rarely found such boardings unreasonable. A boarding, although a seizure for fourth amendment purposes, is a relatively limited one. *See supra* p. 1545. In addition, seafarers can have only a limited expectation of privacy on their vessels. *United States v. Herrera*, 711 F.2d 1546, 1552 (11th Cir.1983). They are exposed to a "raft of regulations designed to promote their safe passage." *United States v. Ortega*, 644 F.2d 512, 514 (5th Cir. Unit B 1981). Under international law, for instance, a nation may exercise jurisdiction over its flag vessels wherever they may be on the high seas. *See United States v. Rodgers*, 150 U.S. 249, 264, 14 S.Ct. 109, 115, 37 L.Ed. 1071 (1893). Another international doctrine, the right of approach, gives a warship the right to board a ship of any country to determine the ship's nationality under certain circumstances. *See Postal*, 589 F.2d at 870–72. These considerations

have led us to apply the "reasonable suspicion" standard, not probable cause, to boardings of foreign vessels in international waters, and to hold boardings of foreign vessels in United States waters, *see United States v. Alfrey,* 620 F.2d 551, 554–55 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980), and American vessels anywhere, *see United States v. Thompson,* 710 F.2d 1500, 1504–05 (11th Cir.1983), *cert. denied,* 464 U.S. 1050, 104 S.Ct. 730, 79 L.Ed.2d 190 (1984), — U.S. ——, 105 S.Ct. 2333, 85 L.Ed.2d 850 (1985), reasonable even in the complete absence of suspicion.

▆▆▆ Particularly in light of our already broad understanding of what is reasonable in the context of ship boarding, we have no difficulty concluding that the search of a foreign vessel pursuant to the consent of the vessel's flag state is also reasonable.[5] To hold that American officials may constitutionally board an American ship at any time, but that American officials may not constitutionally board a foreign ship even when the boarding is authorized *both* by American law *and* by the ship's home country, would be to offer those aboard foreign vessels greater constitutional protection than those aboard United States flag ships. Such a distinction would be contrary to the *Williams* court's conclusion that "foreign vessels do not possess some inherent quality that mandates that they receive either more or less fourth amendment protection than American vessels." *Williams,* 617 F.2d at 1081.

▆▆▆ Conceding in brief that Britain's withdrawal of the right to object constituted consent to the search, *see also Green,* 671 F.2d at 51 n. 7 ("negative statement that they do not object" constitutes British consent), the defendants argue that the consent was ineffectual because it came after the boarding had already taken place. We disagree. What is important is that the United Kingdom ratified the decision to board before this case came to trial. The timing of the consent makes no constitutional difference since evidence obtained from a boarding premised on anticipated consent which never materializes would have to be excluded.

### IV.

In sum, we hold that the Coast Guard's stopping and boarding of the JIM HAWKINS was supported by reasonable suspicion that the vessel was being used to smuggle contraband into the United States, and was authorized by the consent of the United Kingdom. Consequently, the district court properly refused to suppress the evidence obtained as a result of the boarding.

AFFIRMED.

HATCHETT, Circuit Judge, dissenting:

To comply with statutory and constitutional requirements, the Coast Guard must have a reasonable suspicion that drug smuggling is occurring before it can stop and board foreign vessels in international waters. *United States v. Williams,* 617 F.2d 1063 (5th Cir.1980). The Coast Guard

---

**5.** Our holding is thus based on logic and our precedents. *Cf. Williams,* 617 F.2d at 1088 n. 29 (declining to consider whether flag state's consent to Coast Guard boarding rendered boarding constitutional because "the record [was] silent about the history of such international agreements").

We note that our holding conflicts with a footnote by the second circuit in *United States v. Streifel,* 665 F.2d 414, 420 n. 8 (2d Cir.1981). The *Streifel* court concluded that permission granted by a foreign sovereign is not the type of "third party consent" to a search envisioned by *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). We do not base our holding on the third party consent

doctrine. The court also cited a former fifth circuit case, *United States v. Conroy,* 589 F.2d 1258, 1265 (5th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979), for the proposition that "if the boarding had been unreasonable under the Constitution, permission from a foreign sovereign could not cure the constitutional infirmity." *Streifel,* 665 F.2d at 420 n. 8. We find *Conroy* to be inapposite here. The *Conroy* court stated that "[t]he mere consent of foreign authorities to a seizure that would be unconstitutional in the United States does not dissipate its illegality. ..." *Conroy,* 589 F.2d at 1265. Be that as it may, the boarding at issue here would have been *constitutional* in United States waters. *See supra* p. 1547.

did not have a reasonable suspicion that the JIM HAWKINS was being used to smuggle contraband into the United States. Therefore, I dissent.

### I.

The initial inquiry is: whether the Coast Guard had authority to stop and board the JIM HAWKINS, a foreign vessel, on the high seas. "A warrantless seizure or search in the complete absence of authority—a lawless governmental intrusion—is unconstitutional per se." *Williams*, 617 F.2d at 1074.

If the Coast Guard can point to some authority for its search and seizure, the question becomes whether, acting pursuant to this authority, the Coast Guard satisfied fourth amendment "reasonableness" requirements.

The Coast Guard points to 14 U.S.C. § 89(a) for its authority to stop and board foreign vessels in international waters. *Williams* held that such statutory authority exists whenever the Coast Guard has a reasonable suspicion that a vessel is being used to smuggle contraband into the United States. If the Coast Guard holds a reasonable suspicion that drug smuggling is occurring before it stops and boards a foreign vessel, the action does not contravene the fourth amendment's requirement that all searches and seizures be reasonable. *Williams* at 1089.

The Coast Guard in this case, however, did not have a reasonable suspicion that the JIM HAWKINS was engaged in drug smuggling, therefore, its actions in stopping and boarding the vessel failed to comply with statutory and constitutional requirements, and the contraband recovered as a result of the illegal search and seizure should have been suppressed.

### II.

Whether reasonable suspicion exists in a particular case depends on the totality of the circumstances. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 n. 10, 95 S.Ct. 2574, 2582 n. 10, 45 L.Ed.2d 607 (1975). A hunch or generalized suspicion of criminal activity, however, is insufficient. *United States v. Villamonte-Marquez*, 652 F.2d 481, 488 (5th Cir.1981), *rev'd on other grounds*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983).

Coast Guard Commander Pettit testified to six factors from which he inferred that the JIM HAWKINS was being used for drug smuggling: (1) the vessel was traveling along a route frequented by drug smugglers; (2) the vessel had a Grand Cayman home port signature on its stern even though built and registered in the United States; (3) the vessel was riding low in the water; (4) the vessel's water line was dirty; (5) the vessel was proceeding by motor instead of sail; and (6) the vessel denied the Coast Guard permission to board. These innocuous factors could not give rise to a *reasonable* suspicion of criminal activity. At most, Commander Pettit had a hunch, acted on it, and happened to be right.

I do not contend that "circumstances must be completely inconsistent with innocent activity before they may support reasonable suspicion". I do not contend, however, that reasonable suspicion must be based on more than an officer's subjective beliefs or hunches as to whether criminal activity exists. The government must be able to point to articulable facts from which the presence of illegal activity may be inferred. *United States v. Brignoni-Ponce*, 422 U.S. at 884, 95 S.Ct. at 2582.

I also disagree with the majority's conclusion that the Coast Guard could have reasonably suspected that the JIM HAWKINS was bound for the United States. The majority relies on two factors to arrive at its conclusion: (1) "the vessel was headed northeast—not directly toward the United States but ... in a direction and from a locale which made this country a reasonable possibility as a destination"; and (2) "the vessel was traveling along a route known to be frequented by drug smugglers heading for the United States."

The majority reasons that these factors dispose of the issue as to whether reason-

able suspicion existed that the JIM HAW-KINS was headed for the United States because "propensity to the border in previous experience with traffic patterns may be taken into account in deciding whether there is reasonable suspicion to stop a car in a U.S. border area to check for illegal aliens."

First, the factors cited by the court could not have given rise to a reasonable suspicion that the JIM HAWKINS was headed for the United States. Given the vessel's northeasterly path, the most reasonable assumption is that it was *not* bound for this country. Second, "the substantial differences between a vessel and a landlocked vehicle ... preclude any assumption that the cases defining what is reasonable on land ... control the question what is reasonable on the high seas." *Williams*, 617 F.2d at 1084.

### III.

The majority's conclusion that the Coast Guard's boarding of the JIM HAWKINS was constitutional because the United Kingdom consented to it is also erroneous. The majority found that the Coast Guard had authority to board the JIM HAWKINS pursuant to 19 U.S.C. §§ 1581(h) and 1587(a). These statutes allow "officers of the Customs" to board and examine foreign vessels if the vessels' flag state consents.

The United Kingdom consented to the boarding of the JIM HAWKINS; nevertheless, I disagree with the majority's assertion that the Coast Guard's authority for the boarding was statutorily derived. Consent to board the JIM HAWKINS was given pursuant to the United States/United Kingdom Bilateral Narcotics Agreement.

The question becomes, then, whether acting pursuant to this authority, the Coast Guard satisfied fourth amendment requirements in stopping and boarding the JIM HAWKINS. "The factors bearing on the reasonableness of the seizure of a vessel on the high seas can be assessed only in light of the statute or other source of authority

that is said to have permitted the seizure." *Williams*, 617 F.2d at 1083.

The U.S./U.K. agreement provides in pertinent part:

> The government of the United Kingdom of Great Britain and Northern Ireland agree that they will not object to the boarding by the authorities of the United States, outside the limits of the territorial sea and contiguous zone of the United States ... of private vessels under British flag in any case in which those authorities *reasonably believe that the vessel has on board a cargo of drugs for importation into the United States* in violation of the laws of the United States.

Thus, the U.S./U.K. agreement embodies the same standard as 14 U.S.C. § 89(a): Reasonable suspicion that drug smuggling into the United States is occurring must exist before the Coast Guard can stop and board vessels sailing under the United Kingdom flag.

The Coast Guard did not have reasonable suspicion that the JIM HAWKINS was being used to smuggle contraband into this country.