UNITED STATES of America,
Plaintiff-Appellee,

v.

James PEARSON, Evan Walton Taylor,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Kenneth Daniel RAINEY,
Defendant-Appellant.

Nos. 85–7221, 85–7336.

United States Court of Appeals,
Eleventh Circuit.

June 17, 1986.

Richard L. Watters, Mobile, Ala., for Pearson.

Rose A. McPhillips, Mobile, Ala., for Taylor.

J.B. Sessions, III, U.S. Atty., Gloria A. Bedwell, Asst. U.S. Atty., Mobile, Ala., for the U.S.

Desmond B. Toler, Mobile, Ala., for Rainey.

Before KRAVITCH and HATCHETT, Circuit Judges, and DUMBAULD*, Senior District Judge.

KRAVITCH, Circuit Judge:

The appellants in these cases were indicted together in the Southern District of Alabama for offenses arising out of marijuana smuggling activity. All three appellants were arrested on the high seas by the Coast Guard. Appellant Taylor was arrested on board the vessel AURORA I, a Panamanian freighter. Appellants Pearson and Rainey were arrested on board the

---

* Honorable Edward Dumbauld, Senior U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

ADRIANA BELLE, a fishing vessel of American registry. Appellants Taylor and Pearson were tried together and convicted of possession of marijuana with intent to distribute, 21 U.S.C. § 841(a)(1), conspiracy to distribute marijuana, 21 U.S.C. §§ 841(a)(1) & 846, and conspiracy to import marijuana, 21 U.S.C. §§ 952(a) & 963. Appellant Rainey was tried separately and convicted of the same offenses.

On November 7, 1984, the Coast Guard Cutter ACUSHNET was patrolling the waters forty to fifty miles north of the Yucatan Peninsula. The ACUSHNET received an intelligence report of a suspicious freighter near the Alacran Reef, approximately 200 miles away. The freighter was later identified as the AURORA I. The ACUSHNET proceeded to the reported position and spotted the AURORA I at about midnight; the AURORA I was dead in the water with only a mast light on. Approaching with its lights out, the crew of the ACUSHNET observed the AURORA I rendezvous with a smaller vessel.

The ACUSHNET then made radio contact with the AURORA I, and asked permission to board to verify registration. Consent was given via radio and Lieutenant Hricz led an armed boarding party of five men. While approaching the vessel, Lieutenant Hricz noticed that the vessel had no mast marks to indicate how low it was riding in the water, and that the name of the vessel was recently painted. Once on board, the party assembled the crew of the AURORA I on the stern, and conducted a cursory safety sweep; Taylor identified himself as the master of the vessel. Lieutenant Hricz then examined the papers of the vessel and found them in order. Meanwhile, aboard the ACUSHNET Lieutenant Stark received further intelligence confirming that the AURORA I was involved in smuggling. Lieutenant Stark then joined the boarding party; on board he inspected the log and found that it bore the name of a vessel suspected of smuggling marijuana under a load of cement. The bill of lading showed that the AURORA I was carrying a cargo of cement.

The Coast Guard officers commenced a search in an attempt to account for all of the spaces in the vessel. While inspecting one of the holds, they determined that space in front of the forward bulkhead had been sealed off and detected a smell of marijuana upon inspecting the forward bulkhead in the hold. They then found a vent to the area, which was plugged with a rag; upon removing the rag they detected a strong odor of marijuana. They cut into the bulkhead and discovered 17,500 pounds of marijuana. The Coast Guard boarding party then arrested Taylor and the rest of the crew. The ACUSHNET towed the AURORA I into Mobile.

On November 10, 1984, the crew of the Coast Guard cutter POINT STEEL observed the ADRIANA BELLE five miles off Cape Romano, Florida. A four man boarding party discovered marijuana in their initial safety sweep of the ADRIANA BELLE, and then discovered several thousand pounds of marijuana throughout the vessel. Appellants Pearson and Rainey were arrested and taken to Fort Myers, Florida.

The government presented evidence at trial indicating that the ADRIANA BELLE had taken its load of marijuana off of the AURORA I. First, the log of the AURORA I contained an entry listing the ADRIANA BELLE. Second, government witnesses testified that samples of marijuana taken from the two vessels came from the same source.

**VENUE**

▇ Appellants Pearson and Rainey contend that venue was not proper in the Southern District of Alabama as the ADRIANA BELLE was brought into Florida, not Alabama. Appellants repeatedly have raised this issue below and on appeal, while doggedly refusing to address the applicability of 18 U.S.C. § 3238, which provides:

The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, *or any one of two or more joint offenders, is arrested or is*

*first brought;* but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one or two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

The offenses in this matter were committed on the high seas, Taylor was a "joint offender" with Pearson and Rainey, and Taylor was "first brought" into the Southern District of Alabama. Accordingly, venue was proper in the Southern District under 18 U.S.C. § 3238.

### BOARDING AND SEARCH OF THE AURORA I

All three appellants filed motions to suppress the evidence discovered in the search of the AURORA I, challenging the propriety of the boarding and search. Pearson and Rainey, who were not even aboard the AURORA I, have presented no reason why they have standing to challenge the evidence seized from that vessel. Accordingly, the district court's denial clearly was correct with respect to them.

■ The Coast Guard may stop and board a foreign vessel in international waters under 14 U.S.C. § 89(a) if it has a reasonable suspicion that the vessel is engaged in smuggling contraband into the United States. *United States v. Williams,* 617 F.2d 1063 (5th Cir.1980) (en banc).[1] The reasonable suspicion satisfies both the section 89(a) requirement that the vessel be "subject to the jurisdiction" of the United States, and the fourth amendment requirement that the seizure be reasonable. *Id.* Whether the Coast Guard had reasonable suspicion must turn on the totality of the circumstances. *United States v. Reeh,* 780 F.2d 1541 (11th Cir.1986). Reasonable suspicion must be more than a mere hunch,

yet it may be based on facts consistent with innocent conduct, and a law enforcement officer may assess the facts in light of his or her expertise in detecting smuggling. *Id.*

■ During the suppression hearing in the district court, Lieutenant Stark articulated several facts that raised a suspicion about the vessel. First, he had received intelligence from federal government sources and a Navy plane that a smuggler was in the area. Second, at the time the ACUSHNET approached, the AURORA I was dead in the water. Third, the Coast Guard crew observed a suspicious rendezvous with a smaller vessel; the rendezvous was particularly suspicious because the smaller vessel appeared to be a fishing vessel outside of fishing waters, and neither vessel had running lights on. One need not be an expert to recognize the classic scenario of a mother ship freighter heavily laden with contraband and sitting well off the coast awaiting numerous smaller off-load vessels. We hold that the Coast Guard had reasonable suspicion that the AURORA I was a mother ship conducting off-load operations to smaller vessels bound for the United States.

■ If suspicion remains after the initial boarding and document check, then that reasonable suspicion is sufficient to justify the search of the common areas of a foreign vessel on the high seas. *United States v. Williams,* 617 F.2d 1063, 1089 (5th Cir.1980) (en banc). Here, the suspicion remained and was indeed bolstered by the lack of mast marks on the vessel and the discovery of the incriminating log entries. The search conducted in this case was of the holds and other common areas, not of the personal quarters or effects of the crew. Accordingly, the reasonable suspicion that the vessel held marijuana justified the search. *See also United States v. Lopez,* 761 F.2d 632, 635–36 (11th Cir.1985)

---

1. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209

(11th Cir.1981), adopted as precedent decisions

(no reasonable expectation of privacy in secret compartments on vessels).[2]

## SUFFICIENCY OF THE EVIDENCE

Appellant Taylor contends that the evidence was insufficient to show he knew there was marijuana on the vessel, or that he knew that any marijuana on board the vessel was heading for the United States. We view the evidence in the light most favorable to the government, with all reasonable inferences drawn in favor of the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

■ With respect to Taylor's knowledge of the cargo, although the marijuana was concealed behind a bulkhead, we note that he was not a simple crewman but master of the vessel, and that the vessel had 17,500 pounds of marijuana on board. It is hardly conceivable that some one would have sent the AURORA I out on a drug smuggling mission to rendezvous at a designated spot with smaller vessels without the master being involved.

■ There was also sufficient evidence for the jury to find that the marijuana on board the AURORA I was bound for the United States. The testimony indicated that the AURORA I was lying in the water heavily loaded with marijuana in an area known for mother ships meeting with small vessels bound for the United States. The ADRIANA BELLE was seized soon afterward and only five miles off the coast of Florida; it was carrying marijuana which government experts examined and linked to the AURORA I. Moreover, the logbook of the AURORA I contained an entry referring to the ADRIANA BELLE. Accordingly, the evidence was sufficient for the jury to find that the AURORA I was sit-

ting off the Alcran Reef in order to off-load its cargo of marijuana onto smaller vessels bound for the United States.

## ADMISSIBILITY OF RAINEY'S STATEMENT

Appellant Rainey filed a motion to suppress a statement he gave to two federal agents while he was being held in the Hillsborough County Jail. The district court held an evidentiary hearing on the motion to suppress. The attorney who had been representing Rainey at the time testified that he had given the DEA agents permission to see Rainey. The federal agents testified that they met with Rainey and that they read him his *Miranda* rights before he gave the statement; they further testified that the interrogation was in the afternoon, that it lasted thirty to forty-five minutes, that Rainey appeared to be sound, and that they used no coercion. Rainey took the stand and substantially contradicted the testimony of the other three witnesses. The district court then made findings of fact, finding that Rainey's testimony was incredible, and that the testimony of the other witnesses was truthful.

■ The credibility determination of the district court is not clearly erroneous. Accordingly, the statement was voluntarily made and the district court was correct in denying the motion to suppress the statement.

The appellants raise numerous other contentions.[3] These contentions are frivolous and merit no discussion. The judgments of the district court are AFFIRMED.

---

of the former Fifth Circuit rendered prior to October 1, 1981.

**2.** The government contends that Taylor consented to the search of the vessel. Because we hold that the Coast Guard had reasonable suspicion that the vessel was carrying contraband, we need not address this contention.

**3.** These issues include: the district court's denial of a continuance for Pearson's attorney; the marking for identification of an exhibit which the government did not offer; and the denial of a motion to suppress evidence seized from the ADRIANA BELLE.