**UNITED STATES of America, Plaintiff,**

v.

**David MARRERO, Manuel Alonso, and Aldo Otero, Defendants.**

No. 85–270–Cr.

United States District Court,
S.D. Florida,
Miami Division.

July 22, 1986.

Kathleen Williams, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Stephen J. Goldstein, Mechanic & Goldstein, Miami, Fla., for defendants Alonso and Otero.

Victor T. Gutierrez, Miami, Fla., for defendant Marrero.

### ORDER DENYING MOTION TO SUPPRESS

HOEVELER, District Judge.

On April 14, 1985, at approximately 12:30 a.m., law enforcement officers from United States Customs, Metro-Dade Police, and the Florida Marine Patrol, conducting a joint operation under the direction of Customs, arrested the CHRISTINA, a 27–foot fishing vessel, about two miles off the Florida coast in Customs waters. The officers first saw the CHRISTINA coming from the ocean side of Caesar's Creek, a passage between the ocean and lower Biscayne Bay. Customs Officer White, an officer with 15 years of experience, testified at the suppression hearing that the officers observed a light coming through Caesar's Creek from the ocean. After observing the light, which was shining "continuously all over, down and upwards directions, any angle you could think of," the officers became attentive. Officer Haegg of the Metro-Dade Police, an officer of fifteen years'

experience, testified that he considered continual use of the spotlight unusual due to the risk of losing night vision. It appeared also to Officer Haegg that the operator of the vessel was not familiar with where he was going. Customs Officer Lt. Oliva decided to stop the boat for a document inspection. (The officers had decided to stop any boat they saw at that time for such a document inspection.) The Metro-Dade police boat, with Customs Officer White aboard, pulled up behind the CHRISTINA and turned on its blue lights. The Metro-Dade police boat was between 300 to 500 yards behind the vessel when its blue lights were turned on. The Customs boat was also in pursuit. The Metro-Dade boat turned on its sirens shortly after turning on its blue lights. The CHRISTINA continued northward (even though the captain testified that he had earlier noticed the police boats) for about a half mile and finally stopped. The Metro-Dade police boat then pulled alongside the CHRISTINA. The officers identified themselves as police officers and asked the operator for documentation. The officers wanted to find out, in addition to the vessel's ownership, why the vessel was bearing Coast Guard Auxiliary placards and flying a Coast Guard ensign. The officers considered the CHRISTINA's display of Coast Guard Auxiliary placards and ensign unusual. (The officers learned, prior to boarding, that the CHRISTINA's captain was, in fact, a member of the Coast Guard Auxiliary.) Officer Haegg testified that he had never seen Coast Guard Auxiliary out at night. In addition, one of the men (Defendant Marrero) was wearing a full Coast Guard uniform; the others were wearing Coast Guard-type boarding vests. Officer Haegg testified that he had seen Coast Guard personnel wearing similar vests "all the time when we are out there."

The requested documents were handed overboard to the officers and were found to be in order. Officer White notified his section's communications unit to run a check on the subjects on board. Officer White received confirmation from the section that one David Marrero was possibly involved in narcotics smuggling. The name of the owner and captain of the CHRISTINA was David Marrero. The officers did not receive confirmation during the stop as to whether the suspect David Marrero reported pursuant to the system check was the same David Marrero who was the owner of the CHRISTINA. While Customs Officer White was talking on the radio, one of the crew stated to Metro-Dade Officer Haegg that they were on a Coast Guard mission and were meeting another boat toward Elliott Key (an island in lower Biscayne Bay). Officer Haegg asked crewmember Otero where they were coming from, and Otero responded that they had been outside fishing.

The second police boat, containing Customs Officer Oliva and Florida Marine Patrol Officer McGilvary (an officer with more than eight years of experience), then pulled up alongside the other vessels. Customs Officer White decided that the officers should go aboard the CHRISTINA. Officers McGilvary and White both testified that permission to board the CHRISTINA was given by the captain. Officers Haegg and McGilvary then boarded the vessel, Officer White boarding shortly thereafter. Once aboard, Officer Haegg observed the demeanor of the three men, which appeared to him to be "very nervous, upset, if you will, scared." Sgt. McGilvary wanted to ascertain whether the serial number on the CHRISTINA's hull was identical to the number on the registration.

While aboard, the officers noticed a tackle box and two Cuban "yo-yos" (items of fishing tackle). No officer recalled seeing any bait. Sgt. McGilvary testified that the captain of the CHRISTINA advised him that he had been out fishing but had returned because of the bad weather. Officer Haegg and Sgt. McGilvary each testified that the weather on the night in question was calm; Officer Haegg testified that it was fairly bright. After checking the CHRISTINA's hull identification number, Sgt. McGilvary conducted a topside search of the vessel to make certain that there were no other persons on board other than

the ones that the officers had observed earlier.

While standing at the helm of the CHRISTINA during the topside inspection, Sgt. McGilvary observed that an oversized access panel had been cut into one of the steps forward of the midship storage compartment. Sgt. McGilvary considered this panel unusual—he had operated a similar craft as a Florida Marine Patrol officer for three years—because although the access panel was installed on a step, it was not flush with the step. Sgt. McGilvary considered the placement of the panel on a step unusual and hazardous because a person standing upon it ran the risk of sliding off the edge of the panel and injuring himself. The panel, Sgt. McGilvary noticed, was rather large and had a big wooden cover on it. Sgt. McGilvary testified that in his opinion the access panel was an unusual panel in an unusual location. It was, he felt, a hazard for anybody that walked on the boat and did not serve a normal purpose on the boat. The officer wondered why a panel of that size (approximately 14″ × 6–8″) had been placed in that location.

After looking at the raised wooden access panel, Sgt. McGilvary, still standing topside at the helm, noticed the cabin area's bathroom door, which appeared to have been fastened shut with metallic duct tape. Sgt. McGilvary testified that he then asked the captain whether the captain minded if he looked around in the cabin area. Customs Officer White testified that he heard the captain give an affirmative response to the question. Officer White testified that he did not recall that any restrictions were placed upon Sgt. McGilvary by Defendant Marrero; Officer White testified that Sgt. McGilvary was not told he could not search that particular area (cabin). Sgt. McGilvary did not remember the captain's exact words, but recalled that the captain, in substance, said, "Go ahead." Officer White testified that this conversation took place at the vessel's helm. Defendant Marrero denied giving Sgt. McGilvary permission to look in the below-deck area. Defendant Marrero also testified

that "I didn't tell him not to see or nothing. He is going to do it anyway."

According to the testimony of Customs Officer White and Sgt. McGilvary, the sergeant then went forward in the cabin area, accompanied by Defendant Marrero. When he arrived at the entrance to the cabin, Sgt. McGilvary noticed, in a galley on the starboard side, a chart of the waters between Florida and the offshore waters. Sgt. McGilvary observed that the chart was laying open. He then noticed also that the door to the bathroom (adjacent to the cabin door) had a different kind of knob than he had been accustomed to seeing on that type of boat. He noticed again that the door was taped shut with silver metallic duct tape.

Sgt. McGilvary testified that he was concerned whether somebody was hiding in there and why the door had been taped shut. Sgt. McGilvary testified that he jiggled the knob of the bathroom door to find out if it was locked. He testified that he was curious as to why someone would have a boat with the bathroom door locked. Sgt. McGilvary testified that when he touched the bathroom doorknob, Defendant Marrero came forward, told him that the duct tape had to be taken off the door, and then pulled the duct tape down. All three defendants testified that Sgt. McGilvary, not Defendant Marrero, pulled the duct tape off the bathroom door. When the duct tape was removed, the bathroom door fell partially open. Sgt. McGilvary noticed that the commode had been removed. He also saw three large, oblong, rectangular (1½′ × 2′ × 1½′) metal containers partially covered by a blanket. Sgt. McGilvary testified that usually the area which the door opened into was, on that model boat, a head, with a commode. The commode had been removed from the CHRISTINA.

After Sgt. McGilvary saw the three containers in the bathroom sans commode, he testified that he became concerned about the containers and looked again at the access panel that had been cut into the step. Sgt. McGilvary moved to the panel to verify if it had been cut through a bilge pump

or for what purpose the large panel had been cut.

Sgt. McGilvary raised the panel (a piece of teak covering a hole in the step) and noticed that the bulkhead and bonding stringer had been cut away so that there was no longer a wall. The officer looked down into the enlarged space and saw more metal containers. He put the panel back on and moved a few feet to the midship storage compartment. Sgt. McGilvary testified that as he reached for the handle to lift the cover of the compartment and raised the handle slightly, the captain said, "Okay. You found it." The sergeant testified that he then said, "Found what?" The captain then said, according to Sgt. McGilvary's testimony, "You found what you were looking for." Sgt. McGilvary opened the compartment, in which a man easily could have fit, and saw more metal boxes inside.

Sgt. McGilvary then told Customs Officer White about the containers. The containers were opened (they had been sealed with the same kind of tape that had been used to seal the bathroom door) in the presence of Customs Officer Oliva. The contents field tested positive for cocaine. The officers arrested the captain and crew and seized the twelve containers, which weighed approximately 875 pounds.

## STANDING

The CHRISTINA's captain, Defendant Marrero, and crew members, Defendants Otero and Alonso, have moved to suppress the evidence seized in the search of the CHRISTINA. (Defendant Marrero's standing to contest the validity of the search, as owner and captain of the vessel, is not contested.)

The Supreme Court has held that the Fourth Amendment does not protect subjective expectations of privacy that are unreasonable or otherwise illegitimate. *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). "To receive the protection of the Fourth Amendment, an expectation of privacy must be one that society is 'prepared to recognize as legitimate.'" *Id.* (quoting *Hudson v.*

*Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). The requirement for a justifiable expectation of privacy is twofold. The defendant must show an actual or subjective expectation of privacy in the area searched and the expectation must be one that "society is prepared to recognize as 'reasonable.'" *Hudson v. Palmer*, 104 S.Ct. at 3199 (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).

The Eleventh Circuit and the former Fifth Circuit Courts of Appeal have frequently recognized the need for effective methods to deal with the critical and pervasive problem of the importation of drugs. *See United States v. Lopez*, 761 F.2d 632, 635 (11th Cir.1985) (citing *United States v. Williams*, 617 F.2d 1063, 1087 (5th Cir. 1980) (en banc)). Thus, courts will balance the privacy interest asserted by a defendant in light of "the government's need for effective methods to deal with breaches of public order." *New Jersey v. T.L.O.*, 105 S.Ct. at 741.

In addition, the *Lopez* court noted that the standards which define privacy interests at sea may be more restrictive than those applicable on land: "'the heavy overlay of maritime law and the long practice of regulatory stops, inspections and searches' by Customs officers further diminish the privacy interests of sailors." *United States v. Lopez*, 761 F.2d at 635 (citing *United States v. Herrera*, 711 F.2d 1546, 1553 (11th Cir.1983)).

Bearing these initial observations in mind, the Court notes that the defendants bear the burden of proving a legitimate expectation of privacy in the areas searched. *See Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978).

It is not sufficient that a sailor have the right to exclude others from a ship in order to have a legitimate expectation of privacy, because a Coast Guard officer may board without permission to conduct a safety and document search and

gain access to all common areas of a boat. *United States v. Lopez,* 761 F.2d at 635 (citing *United States v. Herrera,* 711 F.2d at 1553 n. 12). Therefore, neither captain nor crew has a legitimate expectation of privacy ... in an area which is subject to the common access of those legitimately aboard the vessel. *United States v. Freeman,* 660 F.2d 1030, 1034 (5th Cir. Unit B 1981). Such common areas have been held to include cargo holds, ice holds, and engine rooms. *United States v. Lopez,* 761 F.2d at 635 (citations omitted). However, the crew's living and sleeping quarters, and personal, private spaces such as dufflebags and footlockers have been held to be sufficiently private as to confer Fourth Amendment standing upon those with dominion over them when they are subjected to search. *Id.* (citations omitted).

The instant case does not involve the search of such private spaces as the crew members' bunks or personal belongings. Defendants base their privacy claim on three circumstances: the fact that they tried to hide the containers well, the fact that each of them would be remunerated upon delivery of the drugs, and the fact that they had a possessory interest in the drugs for the duration of the delivery run.

The Court now turns to the argument that defendants' efforts to hide the drugs established a reasonable expectation of privacy in the areas searched. While defendants certainly allege an actual expectation of privacy in the metal containers, this Court is bound to follow *United States v. Sarda-Villa,* 760 F.2d 1232, 1236–37 (11th Cir.1985), in which the court was not willing to hold that society is prepared to recognize a justifiable expectation of privacy solely on the basis of defendants' efforts to hide contraband. The *Sarda-Villa* court noted that drug smugglers cannot assert standing solely on the basis that they hid the drugs well and hoped no one would find them. *Id.; United States v. Rodriguez,* 616 F.Supp. 328 (S.D.Fla.1985).

Defendants argue that this cause is factually distinguishable from *Sarda-Villa* because in the instant cause the cocaine was hidden in metal containers which were, in turn, hidden in the storage compartments and the stripped lavatory of the CHRISTINA. The marijuana in *Sarda-Villa* was not concealed in another container, but was plainly visible to anyone looking in the secret compartment. In the instant cause, Defendants argue, their privacy interests are qualitatively different from and greater than the *Sarda-Villa* crew members' privacy interests in the dead space in the hull. The Court recognizes the difference between the *Sarda-Villa* dead space concealment and the container concealment in the instant cause.

■ The Court nevertheless finds that the defendants' privacy interests at issue here are not ones which the Court is prepared to recognize as legitimate. Twelve large aluminum containers (among three sailors) differ greatly from footlockers, suitcases or dufflebags in terms of the uses to which they may be reasonably put and the expectations of exclusive control to which they give rise. *Sarda-Villa,* 760 F.2d at 1237. The Court notes first that Otero and Alonso were mere crew members with no ownership or custodial interest in the premises. There is no showing that they themselves could exclude anyone from the vessel. Second, the sheer number of containers contradicts the concept of legitimate private personal use, especially when the kind of vessel they were carried on is examined. The CHRISTINA is a small pleasure or light fishing craft, not a passenger ship or cargo vessel. Thus, there is no legitimate need of a crew member, who is not preparing for a long ocean voyage, for a large amount of personal luggage space. Third, the containers were unmarked, unidentified, and interchangeable. Thus, no crew member could assert an exclusive interest in any specific container. Fourth, the weight of each container was between seventy-two to seventy-three pounds. Sgt. McGilvary testified that it required two persons to unload one container from the vessel. Because more than one person was required for normal handling of these heavy containers, the ex-

clusivity of access to the containers, central to the concept of an expectation of privacy in the containers, is seriously diminished. Fifth, all of the three areas in which the containers were hidden were areas of the craft to which all persons legitimately aboard the vessel would be expected to have access. Certainly the lavatory (notwithstanding the lack of commode) or storage closet cum shower would be an area to which persons aboard would be occasionally drawn (even if only for a shower). The other areas are storage compartments, in which a sailor, especially on a small craft where space is at a premium, could be expected to look, if not to enter.

█ Next, Defendants contend that because they were to receive money upon delivery of the cocaine, they had an interest in the drugs which is a factor in their favor under the totality of the circumstances relevant to the question of standing. By itself, the fact that they might gain financially from a successful smuggling venture is not sufficient to confer standing. *United States v. Sarda-Villa*, 760 F.2d at 1236.

█ Finally, Defendants claim that they had a custodial possessory interest in the drugs sufficient to confer standing upon them. The uncontroverted testimony is that neither Otero nor Alonso owned the drugs. They had not purchased them. They would not be selling them or receiving any money from their sale. The defendants did not even own or pay for the containers themselves. Thus, they did not own the vessel, the drugs, or the metal containers. Their asserted interest is based upon their having custody over the seized items. However, the items were placed into the various compartments and left there. The record does not show that any crew member was left to guard them. This factual scenario differs greatly from, for example, that of a person carrying a suitcase. There was no intrusion by the government into any defendant's legitimate sphere of personal privacy or into any personal effects of the defendants contained within that protected sphere. *See Robbins v. California*, 453 U.S. 420, 424, 101 S.Ct.

2841, 2844, 69 L.Ed.2d 744, 749 (1981). The defendants were not in a position to direct the movements of the drugs or the vessel. They were merely delivery men for the purposes of loading and unloading. Any interest they had was only in the safe passage of the vessel so that delivery could occur. Without any greater interest in the vessel, cocaine, or containers, this Court is unwilling to confer standing solely on the basis that the crew members loaded the vessel and hoped to be paid upon delivery of the goods.

Viewing the legitimacy of these defendants' privacy claims under the totality of the circumstances, *Rakas*, 439 U.S. at 152, 99 S.Ct. at 435, 58 L.Ed.2d at 406 (Powell, J., concurring), the Court finds that Defendants Alonso and Otero have not established standing to contest the validity of the search and seizure at issue here.

## VALIDITY OF THE SEARCH

Even if the Defendants Alonso and Otero could show that they have standing along with Defendant Marrero (the vessel's owner) to contest the validity of the search of the CHRISTINA, the Court finds that the search of the CHRISTINA was valid and permissible under the Fourth Amendment.

█ The Supreme Court held in *United States v. Villamonte-Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), that Customs officials do not violate the Fourth Amendment when, acting under 19 U.S.C. § 1581(a), they stop and board any vessel for inspection of documents at any time, on any navigable waters accessible to the open sea, without any reasonable suspicion to believe that there has been a crime or a border crossing. Even though the documents in the instant cause were inspected overboard, as explained above, the officers wanted to verify the hull identification number. They were justified in boarding for that purpose under *Villamonte-Marquez, supra*. *See U.S. v. One (1) 1982 28' International Vessel*, 741 F.2d 1319 (11th Cir.1984) (mere fact that boarding officers suspect customs and narcotics violations does not taint the validity of a safe-

ty and documentation stop on the high seas); *United States v. Herrera*, 711 F.2d at 1554 n. 13.

■ Moreover, the officers were justified in making an investigatory stop and then boarding the vessel based on reasonable suspicion. *See United States v. Manbeck*, 744 F.2d 360 (4th Cir.1984); *United States v. Herrera*, 711 F.2d at 1546; *United States v. D'Antignac*, 628 F.2d 428 (5th Cir.1980). The articulable facts upon which these experienced officers could base reasonable suspicion for a limited investigatory stop are rather numerous in this case. These facts include the time of day of the sighting of the CHRISTINA, the geographic location of the sighting, the vessel's continual use of its spotlight, its erratic movements, its delayed response to the police pursuit, the fact that it was flying a Coast Guard Auxiliary ensign and bearing Coast Guard Auxiliary placards, Defendant Marrero's Coast Guard uniform (and the Coast Guard-type blue boarding vests worn by the crew member defendants), the appearance of Marrero's name on the list of suspected smugglers, the inconsistent responses given by the captain and crew when asked at separate times what the purpose of their trip was, and the visible paucity of fishing equipment on the vessel. *Cf. United States v. Reeh*, 780 F.2d 1541 (11th Cir.1986) (vessel traveling on route often used by drug smugglers; denial of Coast Guard request for boarding permission sounded defensive and legalistic); *United States v. Elkins*, 774 F.2d 530 (1st Cir.1985) (officers noticed several potential safety hazards and peculiarities of the boats, including alterations made to the fuel tank; demeanor of the vessel's master was visibly nervous); *United States v. Lopez*, 761 F.2d 632 (11th Cir.1985) (vessel riding low in the water; officers noticed unaccounted-for space on board the vessel); *United States v. Manbeck*, 744 F.2d 360 (4th Cir.1984) (officers noticed no shrimp nets on the shrimping trawlers; systems check run on the vessels indicated that they might be involved in drug smuggling); *United States v. One (1) 1982 28' International Vessel*, 741 F.2d 1319 (11th Cir.1984) (officer suspected that vessel's operator was trying to deceive observers into thinking that he was shrimping; visible alterations to vessel and unaccounted-for space below deck); *United States v. Andreu*, 715 F.2d 1497 (11th Cir.1983) (vessel sighted late at night, an "unusual" time; alterations to vessel's deck); *United States v. Herrera*, 711 F.2d 1546 (11th Cir.1983) (late hour of the sighting contributed to officers' suspicions); *United States v. Gollwitzer*, 697 F.2d 1357 (11th Cir.1983) (crew members gave unsatisfactory responses to the officers' questions; crew members acted nervously); *United States v. D'Antignac*, 628 F.2d 428 (5th Cir.1980) (vessel's erratic movements, coupled with the late hour of the sighting, aroused officers' suspicions); *United States v. Kleinschmidt*, 596 F.2d 133 (5th Cir.1979) (late hour of the sighting; name of the vessel was on a list of suspect ships furnished to Customs officials by police).

Reasonable suspicion depends on the totality of the circumstances, *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 n. 10, 95 S.Ct. 2574, 2582 n. 10, 45 L.Ed.2d 607 (1975), and an officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling. *United States v. Reeh*, 780 F.2d 1541, 1544 (11th Cir.1986) (citing *Brignoni-Ponce, supra*). Thus, the Court finds that the aggregation of the articulable facts in this cause more than sufficed to constitute reasonable suspicion. As stated by the court in *United States v. Reeh:*

> ... [A]ny of the circumstances, taken individually, might not seem particularly suspicious. Even considered as a group, such circumstances could very well be present in the absence of criminal activity.... [H]owever, that particular circumstances do not *necessarily* indicate illegal conduct does not mean that the circumstances do not support a *reasonable suspicion* of illegal conduct.

780 F.2d at 1545 (emphasis in original).

■ Once legally aboard the vessel, the officers noticed several other things which elevated their reasonable suspicion into probable cause. Officer Haegg noticed the demeanor of the men aboard, which ap-

peared to be very nervous and upset. (This would not be surprising, considering that all of the defendants testified that they knew cocaine was in the containers.) Sgt. McGilvary testified that the vessel's captain told him that they had returned from fishing because of the bad weather. However, the officers testified that the weather was calm that night. (Also, it does not appear to have been unreasonable for the officers to have been suspicious of the "out fishing" response in light of the fact that Defendant Marrero was wearing his Coast Guard uniform; such apparel for fishing, while not completely implausible, is certainly unusual enough to give rise to a question concerning the credibility of the response.) Sgt. McGilvary then noticed that the access panel on the steps leading to the below-deck area was unusual and hazardous. This observation was made while the officer was still topside. Further, from his position at the helm and without having entered the cabin, Sgt. McGilvary noticed that the cabin area's bathroom door was fastened shut with metallic duct tape. Sgt. McGilvary, descending the step, noticed an open chart of the waters between the Florida coast and the ocean. Sgt. McGilvary testified that he was concerned that somebody was hiding in the cabin area. While there is a conflict in the testimony as to who opened the bathroom door, it is undisputed that the door was opened and that three metal containers were found inside. Thereafter, the remaining nine containers were discovered in their respective hiding places.

This Court finds that the officers here had probable cause to conduct a full stem-to-stern search of the CHRISTINA. The Court notes that there was, before boarding, a congeries of facts supporting reasonable suspicion. Once aboard the vessel, the additional observations of the officers, taken together with those made before boarding, were sufficient to raise their reasonable suspicion to the level of probable cause. *See United States v. Lopez,* 761 F.2d at 637–38; *United States v. Herrera,* 711 F.2d at 1556. The standard employed by the Court in this case in determining whether probable cause existed is whether there were facts and circumstances known to law enforcement officials which could have warranted their reasonable belief that a crime had been or was being committed, or whether viewing such facts in their totality, together with the synthesis of what the agents collectively heard, knew and observed, all considered in light of the agent's individual experience, there was the probability that criminal activity was afoot. *See United States v. Lopez,* 761 F.2d at 636 (citations omitted). In this case, the totality of the circumstances observed by the officers before and after boarding gave them reason to believe that criminal activity was afoot and established probable cause for a full search of the vessel. *Id.* at 637.

In any event, even if the officers did not have probable cause before the bathroom door was opened and the containers were revealed, they clearly had probable cause to conduct a search of the vessel once the containers were discovered. The question then is whether Sgt. McGilvary was justified in looking in the particular area where the initial containers were discovered. The Court leaves aside the question of whether consent to look in the area was given by Defendant Marrero and whether Marrero himself opened the bathroom door, because the Court finds that Sgt. McGilvary was justified in looking into the bathroom as part of a protective sweep of the vessel. The officer testified that he was concerned that someone might be hiding in the bathroom.

The court in *United States v. Alfrey,* 620 F.2d 551 (5th Cir.1980) at 555, held that a limited topside inspection, to ascertain whether all persons on board were accounted for, was a justified safety precaution. If someone were hiding in the CHRISTINA's bathroom, he might have an opportunity to dispose of evidence. The court in *United States v. D'Antignac, supra* at 434, found that the possibility of disposal of evidence contributed to the exigent circumstances upon which a protective sweep would be justifiable.

The court held in *United States v. Kent,* 691 F.2d 1376, 1383 (11th Cir.1982), that it was reasonable for an officer conducting a

protective sweep to look through an open door into a below-deck lounge and to take one or two steps down a stairway to view the area, which was readily accessible through the open door. The court relied on *Alfrey*, which held that the limited inspection conducted by the officers was permitted to insure the safety of the officers as they go about their duties. The *Kent* court also found that because the officers had a reasonable suspicion that the vessel was engaged in criminal activity, the extension of the *Alfrey* search was permissible. However, the *Kent* court declined to consider whether the result would be different if an officer had confronted and opened a closed doorway leading to the vessel's interior. *United States v. Kent,* 691 F.2d at 1383 n. 13.

■ This Court holds that Sgt. McGilvary was justified in looking in the bathroom area of the CHRISTINA (assuming *arguendo* that the sergeant, rather than Defendant Marrero, opened the door). The officers, as noted above, had a plenitude of facts upon which reasonable suspicion could be based when the bathroom door was opened. Also, Sgt. McGilvary was familiar with the vessel, having operated a similar model for three years with the Florida Marine Patrol. His testimony shows that he knew that the door fastened shut with the tape was a bathroom door. This was not, then, an opening of a closed doorway leading to the vessel's interior or to its private living quarters. *See United States v. Kent,* 691 F.2d 1382, 1383 n. 13.

In view of the facts that Sgt. McGilvary knew that the door being opened led to the bathroom (no other door had had to have been opened before the taped door was observed), the officers on board had reasonable suspicion to suspect that a crime had been or was being committed, and the opening of the bathroom door was minimally intrusive and caused no property damage, the Court holds that the officer was justified in looking in the bathroom doorway or in opening the door in order to ascertain whether a person was hiding in the area. *See generally United States v. Kent,* 691 F.2d at 1383 n. 14 (trial judge noted that "in today's world of drug smug-

gling, a police officer is a little bit nutty if he doesn't look down into the hold to see if there is somebody else crouched down there, because weapons are on the boats...")

Whether under the probable cause rationale or the protective sweep based on reasonable suspicion rationale, the law enforcement officer in this cause was justified in opening the door. Of course, after the metal containers were seen in the bathroom, the officers had probable cause to conduct a stem-to-stern search of the vessel. Sgt. McGilvary next looked under the suspicious access panel and found structural modifications as well as more containers. The last containers were found in the midship storage compartment. Only after all of the containers were found were any of them opened.

■ After finding the twelve containers, the officers were certainly justified in opening them. As the Supreme Court held in *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982):

> ... [C]ertainly Congress intended customs officers to open shipping containers when necessary and not merely to examine the exterior of cartons or boxes in which smuggled goods might be concealed. During virtually the entire history of our country—whether contraband was transported in a horse-drawn carriage, a 1921 roadster, or a modern automobile—it has been assumed that a lawful search of a vehicle would include a search of any container that might conceal the object of the search.
>
> \*   \*   \*   \*   \*   \*
>
> If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.

456 U.S. at 820 n. 26, 825, 102 S.Ct. at 2170 n. 26, 2173, 72 L.Ed.2d at 591 n. 26, 594.

In conclusion, the Court reiterates that the officers were justified in boarding the vessel on both the grounds of document and safety inspection and reasonable suspicion. Once aboard the vessel, the officers' reasonable suspicion ripened into probable

cause to search the entire vessel. Even if probable cause had not been reached before the bathroom door was opened, such opening was justified as part of a protective sweep based on the totality of factual circumstances present in the cause. The finding of the containers in the bathroom created additional probable cause to search other storage areas of the vessel. Accordingly, the defendants' motion to suppress is DENIED in its entirety.